JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
 *jakro@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone:  (213) 443-4355
Facsimile:  (213) 443-4310

MARK D. POLSTON (Bar No. 144154)
 *MPolston@kslaw.com*
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W. Suite 900
Washington, D.C. 20006
Telephone: (202) 737-0500
Facsimile:  (202) 626-3737

Attorneys for Plaintiff
SANTA YNEZ VALLEY COTTAGE HOSPITAL

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SANTA YNEZ VALLEY COTTAGE HOSPITAL,<br><br>             Plaintiff,<br><br>        v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,<br><br>             Defendant. | Case No.<br><br><br>**COMPLAINT** |

Plaintiff Santa Ynez Valley Cottage Hospital ("Plaintiff" or "the Hospital") brings this Complaint against Defendant Robert F. Kennedy, Jr., in his official capacity as the Secretary (the "Secretary") of the Department of Health and Human Services ("HHS"), challenging the unlawful termination, by the Centers for Medicare & Medicaid Services ("CMS"), of Plaintiff's Critical Access Hospital status under 42 C.F.R. § 498.5, set to take effect on January 31, 2026, and alleges as follows:

## I. INTRODUCTION

1. Plaintiff operates an 11-bed hospital that provides necessary acute care services to the population of the more than 20,000 residents living in California's Santa Ynez Valley, as well as the many thousands who work in the Santa Ynez Valley on a permanent or transient basis and, of course, the many more who visit Santa Ynez Valley (including its towns of Solvang, Los Olivos, Buellton, Santa Ynez, and others) every year.

2. In 1995, the Hospital was in dire financial condition, having only enough funding on hand for approximately two weeks' payroll, and was at risk of closure. Recognizing the impact to the region of losing the hospital, the Hospital entered into an affiliation agreement on April 13, 1995, and became part of the Cottage Health system. This affiliation brought additional healthcare resources, staff, equipment and services to the Santa Ynez Valley.

3. In order to further shore up funding to continue to provide necessary services to the region, the Hospital applied for and was designated as a "Critical Access Hospital" on February 24, 2010, by Defendant, through CMS, based on the satisfaction of criteria set forth by Congress for certain hospitals to qualify for preferential Medicare reimbursement at 101 percent of their reasonable costs incurred to provide care to program beneficiaries. The Hospital has operated as a Critical Access Hospital for more than 15 years, during which period CMS has conducted recertification reviews (validating the Hospital's status).

4. One of Congress's criteria for Critical Access Hospital status involves the hospital's location relative to other hospitals. To be designated as a Critical Access Hospital under the Medicare statute, the hospital must be "located more than a 35–mile drive (or, in the case of mountainous terrain or in areas with only secondary roads available, a 15–mile drive) from a hospital, or another" Critical Access Hospital. 42 U.S.C. § 1395i-4(c)(2)(B)(i)(l). CMS adopted Conditions of Participation regulations for Critical Access Hospitals implementing this requirement by clarifying

that the 35-mile drive requirement applies to "primary roads" which are defined as "(i) A numbered Federal highway, including interstates, intrastates, expressways, or any other numbered Federal highway with 2 or more lanes each way; or (ii) A numbered State highway with 2 or more lanes each way." 42 C.F.R. § 485.610(c)(2).

5. Secondary roads are not defined in regulation but are, by inference, those with fewer than two lanes in each direction. A Critical Access Hospital may qualify for application of the "secondary roads" criterion if there is a "combination of primary and secondary roads between it and any hospital so long as more than 15 of the total miles from the hospital or other Critical Access Hospital consists of areas in which only secondary roads are available." 87 Fed Reg. 71748, 72207 (Nov. 23, 2022). CMS's State Operations Manual requires Medicare to calculate the 15-mile requirement by "measur[ing] the total drive distance between the Critical Access Hospital and each hospital or Critical Access Hospital located within a 35-mile drive and *subtract[ing] the portion of the drive in which primary roads are available*. If the result is more than 15 miles for each drive to a hospital or Critical Access Hospital facility, the 15-mile criterion is met." CMS Pub. 100-07 Ch. 2 § 2256A (emphasis added).

6. Despite recognizing the Hospital as a Critical Access Hospital for more than 15 years, during a recertification review, which typically occur triennially, CMS issued a determination letter on December 19, 2024, asserting that the Hospital no longer met the distance requirements to qualify for Critical Access Hospital status based on findings that the Hospital is located 33.9 miles from Marian Regional Medical Center in Santa Maria, California, and 21.4 miles from Lompoc Valley Medical Center in Lompoc, California. Complaint Exhibit ("Compl. Ex.") 1. These findings are erroneous, and CMS reached this conclusion despite initially approving the Provider's Critical Access Hospital status in 2010—and recertifying its status in 2018—despite there being no additional hospitals built in the intervening time period, no change in the location of any relevant hospitals, and no additional road routes built between the

3

hospitals, since the initial certification 15 years ago.  CMS's determination letter also provided no support, discussion, or analysis of the nature of the roads, *i.e.*, whether it considered the roads to be primary or secondary roads along the routes. *See id*.

7.    Plaintiff sought reconsideration of CMS's determination and submitted additional evidence into the record challenging CMS's conclusions that the two hospitals in question were closer than the required distance.  As to the first hospital, Plaintiff's evidence demonstrated that CMS's measurement of the 33.9-mile distance on the Google Maps driving route between Santa Ynez Valley Cottage and Marian Regional Medical Center was erroneous because the distance between the Hospital and Marian Regional Medical Center is 36.4 miles on the relevant primary roads—U.S. 101 and CA 246.  Plaintiff identified the error in CMS's new measurement as calculating the distance using a secondary route between the two hospitals which included a stretch of nearly seven miles on Alamado Pintado Road.  But this road is one-lane-each-way and is not a numbered state or federal highway and does not qualify as a primary road under CMS's regulation.  CMS's conclusion, therefore, is factually erroneous and contrary to the plain language of its own regulation (which requires CMS to measure the 35-mile distance requirement *on* primary roads).  *See* Compl. Ex. 2.

8.    As to the second hospital, CMS's conclusion is also wrong.  Plaintiff provided evidence to CMS showing that the 21.4-mile driving route from Lompoc Valley Medical Center to Santa Ynez Hospital clearly includes more than 15 miles on secondary roads, just as it did in 2010 when the Hospital was first determined to meet the distance requirement. *Id*.  Presumably CMS has changed its methodology for measuring road distances or its understanding as to what constitutes a secondary road—again, contrary to its regulation which requires a distance of 15 miles on secondary (*i.e.,* two-lane, unnumbered) roads—but has provided no reasoned explanation for its change in methodology.

4

COMPLAINT

9. Despite being presented with evidence that its findings relied on a new and incorrect application of its own regulation regarding the Critical Access Hospital distance requirements, CMS affirmed the findings of its initial December 19, 2024, letter in a reconsideration denial letter issued on May 2, 2025. *See* Compl. Ex. 3. CMS's reconsideration letter declared that Plaintiff is no longer eligible to remain a Critical Access Hospital and must convert to another provider type in the Medicare program by December 31, 2025, to avoid termination of its agreement to participate in Medicare. *Id*. CMS later agreed to extend the deadline to January 31, 2026. *See* Compl. Ex. 4.[1]

10. CMS's May 2, 2025, letter also did not explain CMS's reasoning as to why roads that had remained unchanged for more than 15 years, and which CMS concluded met the 35-mile and 15-mile requirements in 2010 and 2018, suddenly measured below those distances. During a telephone call the same day, however, CMS representatives only stated that they had looked at Google Maps and that the "technology improved."

11. Plaintiff timely filed an appeal of CMS's decision through a request for a hearing before an Administrative Law Judge ("ALJ") in the agency's Departmental Appeals Board on June 30, 2025, seeking to reverse the agency's termination of Critical Access Hospital status. *See* 42 C.F.R. § 498.40 *et seq*. *See* Compl. Ex. 5.

12. On September 19, 2025, CMS requested that the case be remanded to CMS pursuant to 42 C.F.R. § 498.78 to permit review and consideration of new information. On September 22, 2025, the ALJ ordered that the case be remanded to CMS and dismissed. *See* Compl. Ex. 6 (Order Vacating Order of Remand and Dismissal, Department of Health and Human Services Departmental Appeals Board Administrative Law Judge (Nov. 17, 2025)).

---

[1] Counsel for Defendant has informed Plaintiff that the termination date would be delayed for another 30 days.

13.     On October 2, 2025, the Hospital filed a motion for an extension of time to file an objection to the remand order and reserved the right to request that the order of dismissal be vacated. *Id.*

14.     On October 6, 2025, the ALJ issued an order construing the request as a motion to vacate the dismissal and remand. CMS did not oppose the motion to vacate, and the ALJ vacated the dismissal and remand order pursuant to 42 C.F.R. § 498.72. The ALJ then set the following briefing schedule: CMS's Initial Brief and exhibits would be due on December 12, 2025. The Hospital's Response brief is due by January 16, 2026, and CMS's Reply is due by February 2, 2026.

15.     Pursuant to the schedule, CMS filed its brief on December 12, 2025. In a declaration, executed on December 10, 2025, CMS again stated in a conclusory fashion that the Hospital was too close to Marian Medical Center and Lompoc Valley Medical Center to qualify as a Critical Access Hospital.

16.     CMS's declaration was *post hoc* and deficient. It did not make reference to the fact that CMS had clearly changed positions after 15 years of concluding during multiple recertification reviews that the Hospital met the Critical Access Hospital conditions of participation, including the distance requirements. Moreover, CMS offered no explanation as to what accounted for its change in position regarding the distances between Santa Ynez Valley Cottage Hospital, Marian Hospital and Lompoc Hospital and how this new determination was consistent with its regulations. These failures render CMS's decision arbitrary and capricious.

17.     Briefing in the administrative appeal will not be completed and the ALJ's decision will not be issued before the January 31, 2026, deadline—the date by which Plaintiff will lose its Critical Access Hospital status and be terminated as a provider in the Medicare program. Given that the ALJ will not issue a decision before the agency's termination takes effect, the Provider seeks an order from this Court staying the termination of Plaintiff's Critical Access Hospital status until Plaintiff receives a final, favorable decision from the administrative process or, in the event the final decision is

6

COMPLAINT

that Plaintiff should be terminated from Critical Access Hospital status, Plaintiff's appeal of that decision is heard by this Court.

18.     Losing Critical Access Hospital status before its administrative appeal is decided will cause certain and irreparable harm to Plaintiff.  If the Hospital were actually terminated from the Medicare program, it would be forced to close.  To avoid closing, the Hospital will be forced to convert from a Critical Access Hospital to a general acute care hospital.  That conversion would cost the Hospital over $6 million in reduced annual Medicare reimbursements (which is 20% of its total annual revenue) and would put the Hospital in a significant operating loss.  Plaintiff is aware of several hospitals that have closed after losing Critical Access Hospital status, resulting in the loss of local inpatient or emergency services.  *See, e.g.*, Ana B. Ibarra, *Another California county is losing its only hospital after feds refuse to step in*, LA TIMES (Sept. 13, 2025), https://www.latimes.com/california/story/2025-09-13/another-california-county-is-losing-its-only-hospital-after-feds-refuse-to-step-in.  Plaintiff risks joining this group without temporary relief sought from this Court.

19.     Plaintiff is one of the five hospitals and medical centers operated by Cottage Health.  Cottage is a nonprofit health system that has been providing care in California's Central Coast region for almost 135 years, since 1891.  Cottage Health's mission is "[t]o provide superior health care for and improve the health of our communities through a commitment to our core values of excellence, integrity, and compassion."  In service of that mission, Plaintiff has planned several expansions of the Hospital, including expansion of the emergency department, the installation of MRI services, the expansion of infusion services for cancer patients and other patients, and the addition of other enhanced imaging services.  For the Hospital, a termination of Critical Access Hospital status would mean irreparable damage to its charitable mission to provide superior healthcare.  As a consequence, members of the Santa Ynez community and those receiving healthcare services in it will face longer travel times and have reduced access to advanced imaging, MRI scans, emergency services,

7

COMPLAINT

preventative screening colonoscopies, and other procedures.  The losses will result in poorer health outcomes and have economic ripple effects.

20.    For these reasons, among others, the Hospital plans to seek a Preliminary Injunction to stay the effective date of CMS's revocation of the Hospital's Critical Access Hospital status until the administrative appeal process proceedings are complete.  On the merits, Plaintiff is likely to succeed before the ALJ, or on further appeal if necessary, based on a litany of legal errors underpinning CMS's decision, including:

(a)    CMS violated the plain meaning of the regulatory requirement that a Critical Access Hospital must be "located more than a 35-mile drive *on primary roads*" by including roads that do not qualify as "primary roads" in its 33.9-mile measurement between Plaintiff and Marian Regional Medical Center.   42 C.F.R. § 485.610(c) (emphasis added).  To the extent that ambiguity arises from the regulatory phrase "on primary roads," any  interpretation of the regulatory phrase "on primary roads" under 42 C.F.R. § 485.610(c)(1) that include roads that objectively fail to meet the regulatory definition of a primary road under § 485.610(c)(2) is not entitled to deference.

(b)    CMS also violated its own regulation and policy under the 15-mile secondary roads exception based on the fact that more than 15 total miles of the 21.4-mile route from Plaintiff to Lompoc Valley Medical Center contains portions of the route that are "secondary roads" because they are characterized by a single-lane in one direction of the route.  87 Fed Reg. at 72207; *see also* CMS Pub. 100-07 Ch. 2 § 2256A.

(c)    CMS's determination regarding the distance requirements under 42 C.F.R. § 486.610(c) is arbitrary and capricious agency action because, *inter alia*: (1) CMS failed to provide a reasoned basis for deviating from the plain language of the regulation and its prior interpretations of the regulation as explained in rulemaking; (2) CMS failed to provide a reasoned explanation that engaged with the record evidence provided to it by Plaintiff that meaningfully disputed CMS's findings and application

COMPLAINT

of the primary and secondary roads analysis under the regulation; and (3) CMS's interpretation and application of the distance requirements in Plaintiff's case is contrary to the agency's own stated purpose of amending the distance requirement regulations in 2022 to *increase flexibility* for Critical Access Hospitals seeking certification or recertification. Indeed, CMS's interpretation and application does just the opposite.

(d) While the Secretary has not explained his decision, the Secretary is applying a different substantive legal standard than the Secretary applied in 2010 or in 2018. The Secretary's new legal standard was not adopted through notice-and-comment rulemaking, in violation of the APA and the Medicare statute. 5 U.S.C. § 553; 42 U.S.C. § 1395hh(a)(2); *Azar v. Allina Health Servs.*, 587 U.S. 566 (2019).

## II.   JURISDICTION AND VENUE

21. This action arises under the Medicare Statute, title XVIII of the Social Security Act, 42 U.S.C § 1395 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

22. Jurisdiction is proper under 42 U.S.C. §§ 1395cc(h(1)(A), (j)(8), and 405(g); 28 U.S.C. §§ 1331 and 1361.

23. Venue is proper in this judicial district in accordance with 28 U.S.C. § 1391(e).

## III.   THE PARTIES

24. Plaintiff Santa Ynez Valley Cottage Hospital, Provider No. 05-1331, is located in Solvang, California, within Santa Barbara County, and it operates an 11-bed hospital that has held Critical Access Hospital status since 2010.

25. The Defendant, Robert F. Kennedy, Jr., is the Secretary of Health and Human Services, which administers the Medicare and Medicaid programs established under titles XVIII and XIX of the Social Security Act. Defendant Secretary is sued in his official capacity only. The Centers for Medicare & Medicaid Services is the federal agency to which the Secretary has delegated administrative authority over the Medicare and Medicaid programs. References to the Secretary herein are meant to refer to him,

9

his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

## IV. LEGAL BACKGROUND

### A. Critical Access Hospitals

26. Congress established the "Critical Access Hospital" designation in the Balanced Budget Act of 1997 in response to a significant volume of hospital closures in underserved rural areas during the late 1980s and early 1990s. One objective of Congress was to reduce the financial vulnerability of qualifying rural hospitals, permitting critical access hospitals to be paid at 101 percent of their reasonable costs. 42 C.F.R. § 413.80(a). "Reasonable cost includes all necessary and proper costs incurred in furnishing the services . . . ." 42 C.F.R. §413.9(a). In turn, "necessary and proper costs" are those "costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities [and] are usually costs that are common and accepted occurrences in the field of the provider's activity." 42 C.F.R. § 413.9(b)(2).

27. The Balanced Budget Act of 1997 codified into the Medicare statute that an eligible Critical Access Hospital must be "located more than a 35-mile drive (or, in the case of mountainous terrain or in areas with only secondary roads available, a 15-mile drive) from a hospital, or [another Critical Access Hospital]." 42 U.S.C. § 1395i–4(c)(2)(B)(i). Alternatively, before January 1, 2006, the Critical Access Hospital is certified by the State as being a necessary provider of health care services to residents in the area it will maintain its necessary provider designation after January 1, 2006. *See id*. § 1395i–4(c)(2)(B)(ii).

28. As relevant here, the Health Care Financing Administration ("HCFA") (now, CMS) initially promulgated a regulation implementing Congress's location requirements by effectively parroting the statutory requirement: "The Critical Access Hospital is located more than a 35-mile drive (or, in the case of mountainous terrain or in areas with only secondary roads available, a 15-mile drive) from a hospital or

10

COMPLAINT

another Critical Access Hospital . . . ." 42 C.F.R. § 485.610(b)(4) (1997); *see also* 62 Fed. Reg. 46036, 46008 (Aug. 29, 1997) (The Critical Access Hospital "must be located more than a 35-mile drive from any other hospital or critical access hospital. In mountainous terrain or in areas with only secondary roads available, the mileage criterion is 15 miles.").

29.     In 2015, CMS published sub-regulatory guidance in its State Operations Manual to clarify the 15-mile on secondary roads exception.  But CMS did so not by defining  a "secondary road," but rather by introducing the new term "primary road." *See* CMS Pub. 100-07, Ch. 2 § 2256A (2015).  At that time, CMS's sub-regulatory definition of "primary road" included "[a]ny US highway" or [a]ny numbered State highway with 2 or more lanes each way." *Id*.

30.     In 2022, amid concerns among "providers and interested parties" that the State Operations Manual's definition of primary roads was negatively affecting recertification eligibility for Critical Access Hospitals, CMS proposed to codify and refine the definition of "primary roads" into its regulations "to offer *maximum flexibility* to providers in meeting these distance criteria."  87 Fed. Reg. 40350, 40373 (July 6, 2022) (emphasis added).  CMS proposed to revise § 485.610(c) "to clarify that the location distance for a Critical Access Hospital is one for more than a 35-mile drive *on* primary roads (or, in the case of mountainous terrain or in areas with only secondary roads available, a 15-mile drive) from a hospital or another Critical Access Hospital." *Id*. (emphasis in original).  CMS also proposed, at § 485.610(c)(2), "to specify that primary road of travel for determining the driving distance of a Critical Access Hospital and its proximity to other providers as a numbered Federal highway, including interstates, intrastates, expressways or any other numbered Federal highway; or a numbered state highway with two or more lanes each way." *Id*.  In response to commentors concerns that the lack of a "two or more lanes each way" requirement for Federal highways in the as-proposed definition could lead to unintended consequences of decertifying Critical Access Hospitals, CMS stated:

11

COMPLAINT

Our goal for codifying the definition of primary roads in the regulations language at § 485.610(c) was to provide *greater flexibility*, consistency and clarity to providers with regards to Critical Access Hospital designations. Therefore, we are finalizing the definition of "primary roads" at § 485.610(c) to include numbered Federal highways with two or more lanes each way, similar to the description of numbered State highways, and exclude numbered Federal highways with only one lane in each direction.

87 Fed. Reg. 71748, 72207 (Nov. 23, 2022) (emphasis added).

31. While CMS declines to provide a specific regulatory definition of "secondary roads," *id.*, CMS did articulate through its preamble guidance that "Specifically, this language states that to be eligible for the lesser distance standard due to the secondary road criteria under § 485.610(c), the Critical Access Hospital would have to document that there is a drive of more than 15 miles between the Critical Access Hospital and any hospital or other Critical Access Hospital *where there are no primary roads*." *Id*. CMS also stated its "plan to continue to allow a Critical Access Hospital to qualify for application of the 'secondary roads' criterion if there is a combination of primary and secondary roads between it and any hospital or other Critical Access Hospital, so long as more than 15 of the total miles from the hospital or other Critical Access Hospital consists of areas in which only secondary roads are available." *Id*.

**B.     Reasonable Cost Reimbursement**

32. Hospitals, including Critical Access Hospitals, that are paid on a reasonable cost basis file a cost report at the end of each of their own fiscal years. The cost report records all of the costs incurred by the hospital during the year. A Medicare Administrative Contractor reviews the cost report and reconciles the reported costs with Medicare payments that the provider received during the year. 42 C.F.R. § 405.1803. After any audits, the MAC issues a Notice of Program Reimbursement, which informs

the hospital of the amount of additional reimbursement to which it is entitled, or in the alternative, any excess reimbursement that must be returned to the Medicare program. *Id.*

### D.    Administrative Appeals Process

33.     Providers that are dissatisfied with a determination of CMS affecting the provider's participation in the Medicare program can appeal the agency's determination. 42 U.S.C. § 1395cc(h)(1)(a), (j)(8); 42 C.F.R. §§ 498.40, 498.5. As an initial matter, a provider can request reconsideration of CMS's determination affecting its participation in the Medicare program. 42 C.F.R. § 498.22(a). A request for reconsideration must be filed within 60 days from receipt of the notice of initial determination. *Id.* at § 498.22(b)(3). A provider is also entitled to a hearing before an ALJ and must file a request for hearing within 60 days from receipt of the notice of the initial, reconsidered, or revised determination. *Id.* at § 498.40. If a provider is dissatisfied with the decision of an ALJ, whether a dismissal or an unfavorable decision on the merits, the provider may appeal the ALJ's decision or dismissal to the Departmental Appeals Board ("DAB") within 60 days from receipt of the notice of decision or dismissal. *Id.* at 498.82. A provider dissatisfied with the decision or dismissal of the DAB has a right to judicial review of the DAB's decision or dismissal. *Id.* at § 498.90(a).

### V.    STANDARD OF REVIEW

34.     A reviewing court must set aside agency action held to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E). Judicial review under the APA involves questions of law that are reviewed *de novo*. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 372, 144 S. Ct. 2244, 2247 (2024) (under the APA, the reviewing court—not the agency whose action it reviews—is to "decide *all* relevant questions of law." (emphasis in original)).

35. The "substantial evidence" standard examines such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401 (1971). "Substantial evidence means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Glanden v. Kijakazi*, 86 F.4th 838, 843 (9th Cir. 2023) (cleaned up). A reviewing court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Id*.

36. Generally, cases involving agency decisions are not reviewable by a court unless there has been a final decision by the Secretary. *See* 42 U.S.C. § 405(g). A plaintiff must typically satisfy two requirements before seeking judicial review under 42 U.S.C. § 405(g): a plaintiff must "present" their claim to the Secretary for a decision and then must exhaust all available administrative remedies. *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976). The presentment requirement is not waivable, although the exhaustion may be. *See Haro v. Sebelius,* 747 F.3d 1099, 1112 (9th Cir. 2014) ("Exhaustion is waivable, presentment is not." *(citing Kaiser v. Blue Cross of Cal.,* 347 F.3d 1107, 1115 (9th Cir. 2003)). Waiver is warranted if the claim is "(1) collateral to a substantive claim of entitlement (collaterality); (2) colorable in its showing that denial of relief will cause irreparable harm (irreparability); and (3) one whose resolution would not serve the purposes of exhaustion (futility)." *Sensory Neurostimulation, Inc. v. Azar*, 977 F.3d 969, 981 (9th Cir. 2020). "Futility is established if exhausting administrative remedies would not serve the policies underlying exhaustion:" in contravention of the principles that "the exhaustion requirement allows the agency to compile a detailed factual record and apply agency expertise in administering its own regulations. The requirement also conserves judicial resources. The agency will correct its own errors through administrative review." *Id*.

37. An exception to the Medicare statute's "channeling" requirement exists where application of § 405 "would mean no review at all." *Shalala v. Illinois Council*

14

COMPLAINT

*on Long Term Care, Inc.*, 529 U.S. 1, 17-19 (2000).  Put another way, an exception to exhausting administrative remedies applies when application of the channeling requirement would result in complete preclusion of judicial review.  *Id.* at 22-23.  Another exception to exhaustion under section 405(g) also exists for "any colorable constitutional claim of due process violation that implicates a due process right either to a meaningful opportunity to be heard or to seek reconsideration of an adverse benefits determination."  *Dexter v. Colvin*, 731 F.3d 977, 980 (9th Cir. 2013).

## VI.    FACTUAL AND PROCEDURAL BACKGROUND

38.    On January 4, 2010, CMS certified Plaintiff hospital as a Critical Access Hospital, which took effect on February 24, 2010.  Plaintiff was subject to recertification review by CMS to determine if it still met the requirements to maintain Critical Access Hospital status.  As recently as 2018, CMS determined that Plaintiff met all requirements to maintain its Critical Access Hospital status.

39.    On December 19, 2024, CMS sent a letter to the Hospital during its Critical Access Hospital recertification review stating that the agency had found the Hospital to be noncompliant with the distance requirements of 42 C.F.R. § 485.610(c).  *See* Compl. Ex. 1.  Specifically, CMS alleged that Marian Regional Medical Center was located 33.9 miles from the Hospital , and Lompoc Valley Medical Center was located 21.4 miles from the Hospital.  *Id*.  CMS's letter did not discuss the method the agency used to determine the mileage requirements.  *Id*.  CMS's letter also did not discuss whether the distances identified in its letter consisted of primary or secondary roads along the routes.  *Id*.  CMS's letter invited the Hospital to respond to the letter with any documentation regarding the Hospital's compliance with the distance requirements of  42 C.F.R. § 485.610(c).  *Id.*

40.    On January 17, 2025, the Hospital timely responded to CMS's letter with documentation supporting its compliance with the distance requirements of 42 C.F.R. § 485.610(c).  The documentation included, among other items, a letter from the California Department of Transportation's Research Data Analyst & Functional Class

15

COMPLAINT

Coordinator attesting to the fact that the routes that CMS cited in its December 2024 letter included secondary roads. *See* Compl. Ex. 2

41. Plaintiff's evidence demonstrated that the only driving route from the Hospital to Marian Regional Medical Center *on* primary roads is a 36.4 mile driving route taking State Route 246 to State Route 101. Over 31 miles of this route utilizes State Route 101—a two-lane-each-way primary road. Plaintiff's evidence also demonstrated that CMS's purported sub-35-mile route starts on State Route 246 but then takes Alamo Pintado Road only to later join State Route 101. The California Department of Transportation's Research Data Analyst & Functional Class Coordinator attested that Alamo Pintado Road is a secondary road because it is not a numbered State Highway.

42. Plaintiff's evidence also demonstrated that the 21.4 mile route from the Hospital to Lompoc Valley Medical Center, mainly taking State Route 246, contains more than 15 miles of the route where there is less than two lanes of traffic each way, making those stretches of the route secondary roads for purposes of calculating the distances under 42 C.F.R. § 485.610(c).

43. On May 2, 2025, and contrary to the record evidence, CMS issued a decision denying Plaintiff's request for reconsideration of the revocation of its Critical Access Hospital designation under 42 C.F.R. § 498.5. CMS's decision letter stated:

> After reviewing the hospital's additional information, CMS determined the hospital continues to not meet the distance requirement. Our recertification review determined that Santa Ynez Valley Cottage Hospital is located 33.9 miles from Marian Regional Medical Center in Santa Maria, CA and 21.4 miles from Lompoc Valley Medical Center in Lompoc, CA.

The letter provides no additional information as to how CMS reached its decision in light of the additional evidence, or any other rationale beyond its conclusory explanation. The letter also included that since the Hospital no longer met the

16

COMPLAINT

requirement to participate in the Medicare program as a Critical Access Hospital that it "must convert to another provider type in the Medicare program." Compl. Ex. 3.

44. During a phone call, also on May 2, 2025, CMS explained its decision by saying that it had looked at Google Maps and made a different decision than it had in 2010 or 2018. One CMS representative stated that the technology was better. But CMS did not offer further explanation.

45. On June 30, 2025, Plaintiff filed a request for ALJ review of CMS's decision to terminate the provider's Critical Access Hospital status. *See* Compl. Ex. 5. The outcome of the matter before the ALJ remains pending as of the date of this complaint for relief and is not scheduled to be adjudicated prior to the revocation date of Plaintiff's Critical Access Hospital status.

46. The agency simply sent an amended notice of its May 2, 2025, notice. The only substantive difference being that the amended notice included the Hospital's appeal rights.

47. CMS also verbally informed Plaintiff that it would not discuss an extension of the termination except as a way of facilitating the Hospitals conversion from a Critical Access Hospital to a regular acute care hospital.

## VII.   CAUSES OF ACTION

### COUNT I

**Violation of 5 U.S.C. § 706(2)(A)  - Not in Accordance with Law**

48. The allegations set forth in the preceding paragraphs are incorporated by reference as if fully set forth herein.

49. Under 5 U.S.C. § 706(2)(A), "[t]he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

50. CMS's decision to terminate Plaintiff hospital's Critical Access Hospital status is contrary to law because it violates the express terms of its own regulation under 42 C.F.R. 485.610(c).

COMPLAINT

51.     CMS's May 2, 2025, decision letter states that Plaintiff does not comply with the 35-mile rule because it is 33.9 miles from Marian Regional Medical Center. *See* Compl. Ex. 3.  But CMS did not calculate this distance consistent with its regulation, which require the route be measured "*on* primary roads."  42 C.F.R. 485.610(c); *see also* 87 Fed. Reg. at 40373 (proposing to revise § 485.610(c) "to clarify that the location distance for a Critical Access Hospital is one for more than a 35-mile drive *on primary roads . . . .*" (emphasis in original)).  The route from Plaintiff to Marian Regional Medical Center that measures the distance *on primary roads* – State Route 246 and State Route 101 – is 36.4 miles.  This satisfies the 35-mile requirement.  CMS erred by calculating a different route—one which requires the travel to get *off* primary roads in favor of Alamo Pintado Road.  Alamo Pintado Road is not a State numbered highway and does not have two-or-more lanes of traffic in each direction.  It is unambiguously a secondary road and, therefore, cannot be part of the distance calculation used to find Plaintiff in violation of the 35-mile requirement under the plain meaning of 42 C.F.R. § 485.610(c)(1), (c)(2).

52.     CMS's May 2, 2025, decision letter also violates 42 C.F.R. § 485.610(c)(1) by failing to apply the 15-mile secondary roads exception along the 21.4-mile route from Plaintiff to Lompoc Valley Medical Center.  Eligibility for the 15-mile secondary roads exception is appropriate here as more than 15 total miles of the 21.4 mile route identified by CMS contains sections of the route that do not qualify as primary roads as defined in 42 C.F.R. § 485.610(c)(2) because they do not have two or more lanes each way.  *See* Compl. Ex. 3; 42 C.F.R. § 485.610(c)(2); *see also* 87 Fed Reg. at 72207 (allowing satisfaction of the 15-mile secondary roads exception when there is "a combination of primary and secondary roads between it and any hospital so long as more than 15 of the total miles from the hospital or other Critical Access Hospital consists of areas in which only secondary roads are available."); CMS Pub. 100-07 Ch. 2 § 2256A ("measur[ing] the total drive distance between the Critical Access Hospital and each hospital or Critical Access Hospital located within a 35-mile

18

COMPLAINT

drive and subtract[ing] the portion of the drive in which primary roads are available.  If the result is more than 15 miles for each drive to a hospital or Critical Access Hospital facility, the 15-mile criterion is met.").

## COUNT II

### Violation of 5 U.S.C. § 706(2)(A) – Arbitrary and Capricious

53.    The allegations set forth in the preceding paragraphs are incorporated by reference as if fully set forth herein.

54.    Under 5 U.S.C. § 706(2)(A), "[t]he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

55.    "[I]f an agency action fails to comply with its regulations, that action may be set aside as arbitrary and capricious." *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841, 852 (9th Cir. 2003) (upholding challenge under the APA and finding that "[h]aving chosen to promulgate the [ ] policy, the [agency] must follow that policy").  Here, CMS has failed to comply with the distance requirements of 42 C.F.R. §485.610(c).  *See supra* Count I.  Accordingly, CMS's decision is arbitrary and capricious under 5 U.S.C. § 706(2)(A).

56.    Agency action is considered arbitrary and capricious if, as relevant here, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Here, CMS's decision is arbitrary and capricious under each scenario.  CMS's decision letter fails to account for an important aspect of the problem: whether the calculated distances in question consist of primary or secondary roads along the route.  These distinctions are such an important aspect of determining Critical Access Hospital eligibility that CMS expressly amended its definition of primary roads in regulation to specify when and how the 35-mile requirement, and the 15-mile

COMPLAINT

exception, would apply. CMS's decision letter flatly states that "Santa Ynez Valley Cottage Hospital is located 33.9 miles from Marian Regional Medical Center in Santa Maria, CA and 21.4 miles from Lompoc Valley Medical Center in Lompoc, CA" without any discussion or analysis of the routes along the way as being primary or secondary roads. CMS's failure to offer a reasoned explanation is underscored by the fact that it failed to engage with or meaningfully respond to the evidence provided by Plaintiff demonstrating satisfaction of the 35-mile requirement and the 15-mile exception.

57.     It is arbitrary and capricious for an agency to make an "unexplained departure from policy." *California Pub. Utilities Comm'n v. FERC*, 879 F.3d 966, 978 (9th Cir. 2018). Here, CMS offered no explanation or reasonable basis to depart from its regulation or interpretation as articulated in rulemaking preamble guidance. As stated *supra*, there is simply no reasonable way to interpret the governing regulation that would allow CMS to terminate Plaintiff's Critical Access Hospital status for the reasons the agency asserts. CMS's determination is also arbitrary and capricious for being inconsistent with the intent of the regulation and the agency's own stated reasons for promulgating the governing regulation. In the proposed rule where CMS clarified "*on primary roads*" for the 35-mile requirement, the agency wrote, "Specifically, we propose to revise § 485.610(c) to clarify that the location distance for a Critical Access Hospital is one for more than a 35-mile drive *on* primary roads (or, in the case of mountainous terrain or in areas with only secondary roads available, a 15-mile drive) from a hospital or another Critical Access Hospital." 87 Fed. Reg. at 40373 (emphasis in original). The only reason for CMS to do that would be to make clear that, in determining whether the 35-mile distance requirement is met, the rule means the entire distance must be measured on roads that meet CMS's definition of a primary road. CMS amended the proposed definition of primary road in the final rule, so it included only roads that were four lanes in total—two lanes each way (thereby excluding federal

numbered roads that were less than four lanes from the definition of primary road). 88 Fed. Reg. 297, 299 (Jan. 4, 2023).

58. CMS's decision is additionally arbitrary and capricious because it is not only an "unexplained departure" from its intended policy, but also runs directly contrary to it. CMS responded to commentors' concerns that the proposed mileage calculation would jeopardize existing Critical Access Hospital status by finalizing a definition of "primary roads' that "provide greater flexibility, consistency and clarity to providers with regards to Critical Access Hospital designations." 87 Fed. Reg. at 72207 (emphasis added). CMS's decision reflects a shift in policy that went from offering 42 C.F.R. § 485.610(c) as a shield for rural hospitals to be eligible for Critical Access Hospital status to it now being used as a sword to wield a game of "gotcha" to decertify Critical Access Hospital status and slash reimbursement to providers.

59. Lastly, CMS's refusal to allow the Hospital to remain a Critical Access Hospital while the appeals process plays out is arbitrary and capricious. Most Medicare conditions of participation related to bad conduct of some kind: often fraud or quality of care issues. In those instances, it is reasonable to remove them quickly from the Medicare program. But here the opposite is true. The termination of Plaintiff's Critical Access Hospital status is not pursuant to protecting patients from a provider acting improperly, or to protect the Medicare program from fraud. The Critical Access Hospital status termination is pursuant to bureaucratic distance requirements—requirements that have been applied incorrectly. Terminating the Plaintiff's Critical Access Hospital status will have the opposite effect usually intended by termination decisions: it will significantly compromise the ability of the Plaintiff to provide care in a way that is financially sustainable, and as a result Medicare beneficiaries in the Plaintiff hospital's geographic area are likely to struggle to access critical care. This outcome runs contrary to CMS's goals of establishing Critical Access Hospital status in the first instance, to reduce the financial vulnerability of qualifying rural hospitals by

permitting critical access hospitals to be paid at 101 percent of their reasonable costs in response to a significant volume of hospital closures in rural areas.

60.    For all these reasons, CMS's determination in terminating the Plaintiff hospitals' Critical Access Hospital status is arbitrary and capricious.

<u>COUNT III</u>

**Violation of 5 U.S.C. § 706(2)(E) – Unsupported by Substantial Evidence**

61.    Under 5 U.S.C. § 706(2)(a), (e), "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "unsupported by substantial evidence."

62.    Agency decisions supported by "substantial evidence" require the examination of relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales, 402 U.S. 389, 401* (1971).  "Substantial evidence means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Glanden v. Kijakazi*, 86 F.4th 838, 843 (9th Cir. 2023) (cleaned up).  A reviewing court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Id*.

63.    As stated *supra*, CMS's decision letter fails to discuss and weigh the evidence provided by Plaintiff that supports its compliance with the regulatory requirement.  Nor does CMS offer any contrary evidence in support of its arbitrary decision.  Indeed, it is impossible to tell from CMS's decision whether CMS believes that the roads have changed, whether they now interpret their regulation and the statute differently, or both.  Instead, CMS just concludes that Plaintiff is located too close to two other hospitals to be a Critical Access Hospital.

64.    Thus, CMS's decision has not provided the "mere scintilla" of evidentiary support, necessary to satisfy the "substantial evidence" standard.  Moreover, the rationale in CMS's decision letter focuses exclusively on the calculated mileage without

22

COMPLAINT

any discussion of whether than calculation includes primary roads or secondary roads. And as Plaintiff has showed; those facts are critical and dispositive to the analysis and outcome of the distance requirements under the regulation. CMS, however, has ignored these important factors and has simply relied upon its own self-serving "specific quantum of supporting evidence" using the naked mileage calculations without anything more that is required.

## COUNT IV

### Violation of 42 U.S.C. § 1395hh(a)(2)) – Notice and Comment Rulemaking

65.    The allegations set forth in the preceding paragraphs are incorporated by reference as if fully set forth herein.

66.    CMS's decision to deviate from its own governing regulation, and apply substantive legal standards not in the regulation, without undergoing notice-and-comment rulemaking is a violation of the Medicare statute.

67.    The Medicare statute requires notice-and-comment rulemaking for any "(1) 'rule, requirement, or other statement of policy' that (2) 'establishes or changes' (3) a 'substantive legal standard' that (4) governs 'payment for services' or 'eligibility of . . . entities, or organizations to furnish . . . services" 42 U.S.C. § 1395hh(a)(2); *see Allina Health Servs. v. Price*, 863 F.3d 937, 943–44 (D.C. Cir. 2017) (holding that the agency must undertake notice-and-comment rulemaking before effectuating the policy reflected in the vacated 2004 rule), *aff'd sub nom. Azar v. Allina Health Servs.*, 587 U.S. 566 (2019) ("*Allina II*").

68.    CMS's termination of the Plaintiff's Critical Access Hospital status entails disregarding the primary/secondary road distinction central to both the statute and the agency's own regulations. In disregarding the primary/secondary road distinction, CMS has implemented an entirely different substantive legal standard whereby it can measure the distance between potentially eligible Critical Access Hospitals by any route it can identify and thereby deprive rural hospitals of Critical Access Hospital status.

69. CMS's deviation from the governing regulation is therefore a new standard that establishes or changes the substantive legal standard governing payment for services and the eligibility to provide services, which requires notice-and-comment rulemaking. Because the agency has not undergone notice-and-comment rulemaking to change this substantive standard, its determination is unlawful.

## COUNT V

### 42 U.S.C. § 405(g) – Exhaustion and Waiver

70. Generally, judicial review is limited in Medicare cases when a Plaintiff has received a final decision by the Secretary. *See* 42 U.S.C. § 405(g). Under 42 U.S.C. § 405(g): a plaintiff must "present" their claim to the Secretary for a decision and then must exhaust all available administrative remedies. *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976). The presentment requirement is not waivable, although the exhaustion may be. *See Haro v. Sebelius,* 747 F.3d 1099, 1112 (9th Cir. 2014). Waiver is warranted if the claim is "(1) collateral to a substantive claim of entitlement (collaterality); (2) colorable in its showing that denial of relief will cause irreparable harm (irreparability); and (3) one whose resolution would not serve the purposes of exhaustion (futility)." *Sensory Neurostimulation, Inc. v. Azar*, 977 F.3d 969, 981 (9th Cir. 2020). "Futility is established if exhausting administrative remedies would not serve the policies underlying exhaustion:" in contravention of the principles that "the exhaustion requirement allows the agency to compile a detailed factual record and apply agency expertise in administering its own regulations. The requirement also conserves judicial resources. The agency will correct its own errors through administrative review." *Id*. An exception to exhaustion under section 405(g) also exists for "any colorable constitutional claim of due process violation that implicates a due process right either to a meaningful opportunity to be heard or to seek reconsideration of an adverse benefits determination." *Dexter v. Colvin*, 731 F.3d 977, 980 (9th Cir. 2013).

71. The Hospital has presented its claim to the Secretary by filing an administrative appeal and waiver of the exhaustion requirement of 42 U.S.C. § 405(g) is appropriate.

72. Here, losing Critical Access Hospital status prior to and without the benefit of an ALJ Hearing is collateral to the substantive issue of Plaintiff's Critical Access Hospital certification and will cause certain and irreparable harm to Plaintiff. For instance, loss of Critical Access Hospital status will result in over $6 million in reduced annual Medicare reimbursements (which is 20% of its total annual revenue), will put the facility in a significant operating loss, force Plaintiff to halt planned expansions of emergency and other services, and damage Plaintiff's charitable mission to provide superior care. Losing Critical Access Hospital reimbursement at 101 percent of reasonable cost would mean, at a minimum, converting to reimbursement at the standard prospective payment rate system. Such a reimbursement system, designed for large acute care hospitals, would cause Plaintiff to operate at a negative net margin, making care at the current level unsustainable.

73. The Hospital has planned to invest more than $40 million to expand services to patients in the region (so they do not have to drive excessive distances or through mountainous areas). The plan for added services include:

74. The expansion of the emergency department to accommodate higher patient volumes. The Hospital's Emergency Department has seen steady increase in demand for services. To meet this growing need the hospital has planned an Emergency Department expansion. Loss of Critical Access Hospital status will threaten the viability of this project. The Hospital's Emergency Department also provides life-saving treatment to local residents who, for example, may experience heavy machinery injuries and rattlesnake bites, conditions that require immediate intervention that would be delayed if travel to the next nearest facility is required.

75. Plans to build a new MRI imaging suite in the hospital, replacing the existing MRI trailer. The current MRI at the Hospital is many years past end of life.

COMPLAINT

Losing MRI services would mean patients would have to travel over 30 miles on difficult terrain to receive necessary imaging services. Each year the Hospital serves over 2,000 patients in need of MRI imaging.

76.     If the Hospital is no longer a Critical Access Hospital and loses 20% of its revenue on an ongoing basis, the Hospital will be forced to cancel these planned additions.

77.     The Hospital will also be forced to curtail procedural services such as screening colonoscopies. In Santa Barbara County, colon cancer is the third leading cause of cancer deaths at 32.5 per 100,000. Early detection is crucial and can prevent up to 80% of related deaths. Loss of these and other procedural services would threaten the health of the Santa Ynez community.

78.     The Hospital will also be forced to reduce outpatient specialty services such as cardiologist visits and infusion services. These outpatient services address the chronic conditions of the local Santa Ynez population and prevent future health problems.

79.     For the Santa Ynez community, if the Hospital has to cancel these planned additions, and worse, has to cut back services, it will mean longer travel times for care, reduced access to emergency services, poorer health outcomes and economic ripple effects that cause harm to the Hospital and the surrounding community.

80.     In addition to the financial hardships, the Hospital currently employs a cardiologist. The Hospital is able to do so, because critical access hospitals have an exception to the California law preventing corporate employment of physicians. If the Hospital is no longer a Critical Access Hospital, it will no longer be able to employee the cardiologist. Losing the cardiologist would negatively impact care at the Hospital and possibly threaten the availability of cardiology services in the Santa Ynez Valley.

81.     These reductions, in addition to the cancelation of the Hospital's planned expansion would interfere with the Hospital's ability to provide superior care in the local community, interfering with the Hospital's and Cottage Health's charitable missions.

COMPLAINT

82.   Plaintiff demonstrates that this appeal is futile by showing that the irreparable harm will occur prior to the outcome of the current proceedings before the agency at the ALJ level.

83.   Additionally, CMS has put the Plaintiff in a "Catch-22" position by demanding the hospital convert to another provider type to continue participation in the Medicare program.  If the Hospital acquiesces and converts to a regular acute care hospital, the hospital may forfeit its rights to appeal the termination of its Critical Access Hospital status. Hospitals have appeal rights from terminations (42 U.S.C. § 1395cc(j)(8); 42 C.F.R. §§ 498.40, 498.5) but not payment statuses.  If Plaintiff fully acquiesces and converts to a regular acute care hospital, per the agency's suggestion, CMS might argue that the appeal of the Critical Access Hospital termination is moot because the hospital won't be terminated from the Medicare program under its new status. Accordingly, the administrative appeals process is likely to result in "no review at all." *Illinois Council*, 529 U.S. at 19 (2000).

84.   For these reasons, waiver of the exhaustion requirement under 42 U.S.C. § 405(g) is appropriate.

## VIII.   REQUEST FOR RELIEF

85.   The Plaintiff hospitals request the following orders:

(a)   Finding that the agency's termination of the Plaintiff's Critical Access Hospital status is contrary to law and arbitrary and capricious;

(b)   Finding that the agency's termination of the Plaintiff's Critical Access Hospital status will cause irreparable harm to the Plaintiff;

(c)   Enjoining CMS from effectuating the termination of Critical Access Hospital status until the administrative process is either fully resolved in Plaintiff's favor or judicial review of a final agency decision is complete.

Respectfully submitted,

Dated:     December 22, 2025               **KING & SPALDING LLP**


By: */s/ Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS
MARK D. POLSTON

Attorneys for Plaintiff
SANTA YNEZ VALLEY COTTAGE
HOSPITAL

COMPLAINT